SALTER, J.
(concurring).
I concur in affirming the judgment of adoption in this case. I write only to emphasize certain parts of the record beyond those detailed by the trial court and my respected colleagues. Those differences pertain to (1) the record regarding the other persons in the adoptive parent’s household and (2) the substantial changes in law and Department of Children and Families’ policy after the Legislature enacted subsection 63.042(3) in 1977.

The Adoptive Parent’s Household

The record has been summarized by Judge Cope. Several additional facts seem pertinent as well. The petitioner (F.G.), his partner Tom Roe, and his partner’s minor child, Tom Roe, Jr.,[15] welcomed into their home the two foster children, then four years old (X.X.G.) and four months old (N.R.G.). The steps taken by the existing three-person household to address the medical, emotional, and educational needs of the two adoptive children are nothing short of heroic. The improvement in every aspect of the children’s care is beyond dispute and was fully corroborated by impartial “collateral informants” — the teachers, doctors, and caseworkers who *97 have personally observed the progress made by the children, for example. In short, the petition below and this appeal involve five persons and associated relationships, not just the adoptive parent and the two children. All five were (and continue to be) living in a fishbowl as a result of the monitoring reports, the home study, and the extraordinary publicity surrounding the case.

The Department Opposes the Statute; Legal Developments After 1977

The Department, while acknowledging a general obligation to follow Florida law (including § 63.042(3)), believes that the categorical ban against adoptions by homosexuals is not in the best interest of children and is contrary to current standards and best practices recommended by social services and child development professionals. The Department’s Tallahassee-based chief of child welfare services and training, as well as the Tallahassee-based adoption program manager reporting to her, both testified that eliminating the categorical ban would promote the best interest of children. Neither of these experienced, caring public servants had seen any instance in which any child was harmed by a homosexual parent or foster parent. These conclusions by the leadership of the agency charged with carrying out state policy regarding abused, neglected, and dependent children are entitled to considerable deference. Verizon Florida, Inc. v. Jacobs, 810 So.2d 906, 908 (Fla.2002).
The categorical ban was enacted in haste and reaction in 1977.[16] Those who voted for it in the legislature did not prohibit the placement of children with homosexual foster parents or permanent guardians — only the permanent step of adoption was addressed. Because the Department has approved homosexuals to serve as foster parents and permanent guardians,[17] the Department now has years of experience and observation to inform its position and its testimony in the trial court.[18] Moreover, the placement of children in those households has allowed bonds and relationships to form that are in the best interests of children — steps toward permanency and stability in young lives that have already known too much pain and separation. In short, the categorical ban and the statutory polestar of “best interests of the children” after an extended and very successful foster placement (as here) are inimical.
Foster parents are carefully informed by the Department that there is no guarantee that they will be able to adopt a child or children placed with them, even *98 when the biological parents’ parental rights are terminated.[19] However, the Department’s case manager for the two children in this case testified that it is standard procedure to place a “hold” on children when a foster parent seeks adoption. The “hold” precluded any action to move the children to a different placement and assured that bonding would continue. The case worker was asked whether anyone else had applied to adopt the two children in this case. He answered:
No, no one else has applied to adopt these two children. However, since the parents’ rights were terminated, and Mr. G. indicated that he wanted to adopt the children, we had to place a hold on the children, because we had, in fact, someone interested in adopting them, and what that means is that they could not go out — they could not be placed— they’re placed on the Adoption Exchange, but they could not go out to the world, because we had someone identified as a prospective parent.
On the day the trial court entered the final judgment of adoption, X.X.G. had lived almost half his young life with his adoptive father and the rest of the household, and N.R.G. had spent over 90% of his life there. The application of the categorical ban in this case would be directly contrary to the State’s “compelling interest in providing a stable and permanent home,”[20] for these children.
When the ban was enacted in 1977, the adoption statute was much shorter. The legislative intent of the “Florida Adoption Act” was summarized at that time in section 68.022(1):
It is the intent of the legislature to protect and promote the well-being of persons being adopted and their natural and adoptive parents and to provide to all children who can benefit by it a permanent family life.
At that time, section 63.142(4) guided the trial court: “At the conclusion of the hearing, when the court determines that all necessary consents have been obtained and that the adoption is in the best interest of the person to be adopted, a judgment of adoption shall be entered.”
The Act was substantially modified in 2001, 24 years after the enactment of the categorical ban. Subsection 63.022(2), part of the 2001 overhaul, states:
It is the intent of the Legislature that in every adoption, the best interest of the child should govern and be of foremost concern in the court’s determination. The court shall make a specific finding as to the best interest of the child in accordance with the provisions of this chapter. (Emphasis added).
“Foremost concern” must also be evaluated in light of a circumstance that was not considered by the Legislature in 1977 (the successful placement of children with homosexual foster parents and permanent guardians). By the time of the trial below, the application of the statutory ban was contrary to both the professional judgment of the Department and the legislative directive to assure “the best interest of the child” in “every” adoption. Confronted with two irreconcilable provisions, the trial court properly followed the later and “foremost” directive. See Cable-Vision, *99 Inc. v. Freeman, 324 So.2d 149, 152 (Fla. 3d DCA 1975) (“any such inconsistency should be resolved in favor of the last expression of the legislative will”).
Similarly, in 2009 the Second District accorded full faith and credit to a Washington state judgment of adoption by a same-sex parent, rejecting a claim that the Washington adoption was contrary to Florida public policy under § 63.042(3). Embry v. Ryan, 11 So.3d 408 (Fla. 2d DCA 2009). The categorical ban was once again subordinated to post-1977 legal developments — in that case, to developments outside Florida.

Conclusion

In striking the categorical ban of section 63.042(3) on equal protection grounds, we need not address the larger controversy regarding same-sex marriage.[21] The Department’s policies and stipulations (Appendix, paragraphs 6 and 8) have made it clear that placement with a married couple, or even an applicant who might later marry, is not the rational basis proffered in support of the ban. The unconstitutionality of this particular categorical ban regarding adoption simply leaves the Department in the position described by its chief of child welfare services in her testimony below:
Q. Okay. So if the state law didn’t exist and the folks in the department were implementing the child welfare policy, would there be a reason to exclude gay people from adopting?
A. If the law didn’t exist, we would use the same criteria to assess those families as any other, and the best interest of the child would be the, would be the norm.
With these few differences in analysis, I concur in affirming the final judgment of adoption.

. The pseudonyms for Tom Roe and his biological son were used in the public version of the final judgment out of concern for the privacy of the son. The record reflects that the son, Tom Roe, Jr. (then eight years old), welcomed the foster children and also participated in the process of improving their lives so dramatically. The home studies found no concerns regarding Tom Roe, Jr. — to the contrary, he was thriving both before and after the household welcomed the other children. The bonds of attachment that have formed over the past six years are not limited to those between the two adopted children and the petitioner; the children have also established strong bonds with Tom Roe and his son (and they with the children). In closing argument to the trial court, the attorney for the Department conceded forthrightly, "there's no dispute that the children are in a wonderful household, that they’re well cared for, and that they’re in a household that will care for them appropriately.” The continued use of the legal system to attempt to unwind these relationships is simply inexplicable. While acknowledging that my colleague is probably correct in his first footnote that "our ruling is unlikely to be the last word,” I express here the hope that it will be, so that all five members of this household are spared further uncertainty.

. A review of the legislative history of the act. Chapter 77-140, Laws of Florida, reflects no input from what was then the Department of Health and Rehabilitative Services (the responsible and affected agency), or from anyone else who might have conducted an organized investigation of any benefit sought to be achieved, or harm to be avoided, by the proposed legislation.

. In 1994, the Second District concluded that (a) Chapter 39, Florida Statutes, required the Department to give foster children the "custody, care, and discipline as nearly as possible equivalent to that which should have been given by [their] parents,” and (b) the Legislature had not "disabled homosexuals or unmarried couples from consideration as foster parents.” Matthews v. Weinberg, 645 So.2d 487, 489 (Fla. 2d DCA 1994), review denied, 654 So.2d 919 (Fla.1995).

.That experience, and the absence of any documented or apparent harm over the past 33 years following passage of the categorical ban, may account for the Department’s decisions (a) not to appeal the 2008 Monroe County circuit court decision finding § 63.042(3) unconstitutional, and (b) not to call any witnesses in another Miami-Dade case, In re: Adoption of M.J.H., in which the same result was reached (that appeal is also pending before this Court as Case No. 3D 10-443).

. The Department's motion to dismiss the petition for adoption below argued that a foster parent has "no justifiable expectation of a permanent relationship” with the children. The children, of course, know nothing of this. They ordinarily develop an ever-increasing attachment and expectation of permanency as each month goes by in a stable setting.

. Section 63.022(l)(a), Florida Statutes (2006); G.S. v. T.B., 985 So.2d 978, 982 (Fla.2008).

. In the recently-decided federal case in California, Perry v. Schwarzenegger, 704 F.Supp.2d 921 (N.D.Cal.2010), many of the same equal protection arguments, and two of the expert witnesses who testified in the adoption case here, were cited in the court's order.